1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TYLER KUHK,

                              Plaintiff,

        v.

PLAYSTUDIOS INC,

                              Defendant.

CASE NO. 2:24-cv-00460-TL

ORDER ON MOTION TO DISMISS
AND COMPEL ARBITRATION

This matter is before the Court on Defendant's Motion to Dismiss and to Compel
Arbitration. Dkt. No. 4. Having considered Plaintiff's Response (Dkt. No. 9), Defendant's Reply
(Dkt. No. 11), Defendant's supplemental authority (Dkt. No. 12), and the relevant record, and
finding oral argument unnecessary, *see* LCR 7(b)(4), the Court DENIES Defendant's Motion.

## I.      BACKGROUND

Plaintiff Tyler Kuhk is a citizen and resident of Washington State. Dkt. No. 1-2 ¶ 1.1.
Defendant Playstudios is an online "global gaming studio" that hosts a collection of free-to-play

online casino games, including Pop! Slots™ Vegas Casino Games ("Pop! Slots"). *Id.* ¶¶ 2.3–2.4.

Plaintiff alleges that "[c]onsumers visiting [Defendant's] casinos for the first time are awarded free chips. But once consumers lose the initial allotment, they cannot continue to play the game without buying more chips in [Defendant's] electronic store." *Id.* ¶ 2.6. "The outcomes of [Defendant's] games are based on chance." *Id.* ¶ 2.7. Since 2019, Plaintiff has played Pop! Slots through Defendant's online platform. *Id.* ¶ 2.8. He purchased chips from Defendant's electronic store after losing his initial allocation of free chips. *Id.* Plaintiff alleges that he has "wagered and lost money at [Defendant's] games of chance" since he began playing in 2019. *Id.* ¶ 2.9.

When navigating to one of Defendant's games, users are directed to a homepage featuring a large, colorful icon showing the title of the game above three sign-in buttons: "Sign in with Apple," "Facebook Connect," and "Guest Login."[1] Below these sign-in options, each game's respective homepage states in light lettering on a dark background, "BY CLICKING CONNECT YOU AGREE TO OUR TERMS OF SERVICE & PRIVACY POLICY." Dkt. No. 10-1 at 2. "Terms of Service" and "Privacy Policy" are in lighter lettering than the rest of the statement. *Id.* Two such homepages are depicted below:

---

[1] The game homepages and Terms of Service were submitted by the Parties as declarations. *See* Dkt. Nos. 10-1 at 2, 10-2 at 2 (game homepages); Dkt. No. 4-1 at 4–23 (Terms of Service). Although the Court normally cannot consider matters outside of the pleadings in deciding a Rule 12(b)(6) motion to dismiss, it may consider such evidence in deciding a motion to compel arbitration. *See Regents of the Univ. of Cal. v. Japan Sci. and Tech. Agency*, No. C14-4419, 2014 WL 12690187, at *4 n.24 (C.D. Cal. Oct. 16, 2014) (listing cases); *e.g.*, *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1009–12 (9th Cir. 2024) (citing to exhibits to motion to compel arbitration); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (same).

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16



17  Dkt. No. 10-1 at 2; Dkt. No. 10-2 at 2. The words "TERMS OF SERVICE" hyperlink to
18
Defendant's Terms of Service. Dkt. No. 9 at 22.
19
20          Defendant's Terms of Service include an arbitration agreement, which lists in relevant
21  part that "[a]ll issues shall be for the arbitrator to decide, including the scope of this Dispute
22  Resolution and Arbitration Provision." Dkt. No. 4-1 at 18.
23          Plaintiff filed this action in Washington state court on February 20, 2024, alleging
24  violations of Washington's "Recovery of money lost at gambling" statute, violations of the

Washington Consumer Protection Act, and unjust enrichment on behalf of a putative class of Washington consumers. Dkt. No. 1-2 at 4–9. On April 5, 2024, Defendant removed this action to federal court on the grounds of diversity jurisdiction. Dkt. No. 1 at 1. Shortly thereafter, Defendant filed the instant motion. Dkt. No. 4.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2 *et seq.*, governs arbitration agreements in most contracts affecting interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that only contracts of employment of transportation workers are exempt). District courts have jurisdiction to determine whether there is an agreement to arbitrate a particular issue, "unless the parties clearly and unmistakably provide otherwise." *In re Van Dusen*, 654 F.3d 838, 843 (9th Cir. 2011). In deciding whether to compel arbitration, a court's inquiry is generally limited to two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If both conditions are met, "the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Id*. Arbitration agreements "shall be valid, irrevocable, and enforceable" in the absence of legal or equitable grounds such as fraud, duress, or unconscionability. 9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted). Where "[t]he crux of the complaint is that the contract as a whole (including its arbitration provision) is . . . invalid," even the validity of the contract becomes a question for the arbitrator to decide. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46 (2006).

A motion to compel arbitration "is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate," so courts

apply the summary-judgment standard when evaluating such a motion. *Hansen v. LMB Mortg. Serv., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). Thus, any doubt is resolved in favor of the nonmoving party.

### III.    DISCUSSION

"The cardinal precept of arbitration is that it is 'simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Ahlstrom v. DHI Mortgage Co., Ltd.*, 21 F.4th 631, 634 (9th Cir. 2021) (quoting *Loc. Joint Exec. Bd. v. Mirage Casino-Hotel, Inc.*, 911 F.3d 588, 595 (9th Cir. 2018) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995))). "Because of this axiomatic principle, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1041 (9th Cir. 2020)). Accordingly, the Supreme Court has instructed that "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Id.* (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)). "Thus, 'where a party contests either or both matters, the court must resolve the disagreement.'" *Id.* (quoting *Granite Rock*, 561 U.S. at 299–300). As articulated above, the summary-judgment standard is appropriate when making this determination. *Hansen*, 1 F.4th at 670.

### A.    Whether Playstudios's Contract is Void *Ab Initio*[2]

The Parties argue at length about Plaintiff's contention that "the Court should deny Defendant Playstudios'[s] motion to force Plaintiff Kuhk into arbitration because the underlying

---

[2] On October 14, 2024, Defendant filed a Notice of Supplemental Authority on this issue. Dkt. No. 12.

1    adhesion 'contract' it seeks to enforce flows from a violation of state law." Dkt. No. 9 at 12.

2    However, the Supreme Court's decision in *Buckeye Check Cashing*, 546 U.S. 440, is directly on

3    point here, determining that "unless the challenge is to the arbitration clause itself, the issue of

4    the contract's validity is considered by the arbitrator in the first instance." 546 U.S. at 445–46

5    (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) and *Southland*

6    *Corp. v. Keating*, 465 U.S. 1 (1984)); *see also Bridge Fund Capital Corp. v. Fastbucks*

7    *Franchise Corp.*, 622 F.3d 996, 1000 (9th Cir. 2010) ("In other words, when a plaintiff's legal

8    challenge is that a contract as a whole is unenforceable, the arbitrator decides the validity of the

9    contract, including derivatively the validity of its constituent provisions (such as the arbitration

10   clause)."); *Nagarampa v. MailCoups, Inc.*, 469 F.3d 1257, 1270 (9th Cir. 2006) (evaluating

11   validity and scope of arbitration clause where plaintiff's challenge went "specifically, and only,

12   to the arbitration clause"). However, "[t]he issue of the contract's *validity* is different from the

13   issue whether any agreement between the alleged obligor and obligee was ever concluded."

14   *Buckeye Check Cashing*, 546 U.S. at 445–46. For the reasons discussed in the following section,

15   the Court finds that no agreement was created by the Parties here. Therefore, it declines to

16   address the issue of whether the contract was void *ab initio* in the context of this motion to

17   compel arbitration.

18   **B.      Whether a Contract Exists between the Parties**

19          **1.       Online Contract Formation**

20          In determining whether a contract exists, courts must apply "ordinary state-law principles

21   that govern the foundation of contacts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944

22   (1995); *see also Marshall v. Hipcamp Inc.*, No. C23-6156, 2024 WL 2325197, at *3 (W.D.

23   Wash. May 22, 2024). Plaintiff asserts, and Defendant does not dispute, that Washington law

24   governs. Dkt. No. 9 at 14–15; Dkt. No. 11 at 5–12. Defendant, as the party seeking to compel

arbitration, must therefore "prove by a preponderance of the evidence that the parties formed an agreement." *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) (applying Washington law) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)).

"Contract formation requires mutual assent." *Marshall*, 2024 WL 2325197, at *5 (citing *Reichert*, 56 F.4th at 1227). In the online context, mutual assent "turns on whether the consumer had reasonable notice of the terms of service agreement." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (applying Washington law). There are two general types of online contracts: "clickwrap" agreements, which present "users with specified contractual terms on a pop-up screen [where] users must check a box explicitly stating 'I agree' in order to proceed," and "browsewrap" agreements, where the website "offers terms that are disclosed only through a hyperlink." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). In contrast to clickwrap agreements, which are routinely considered enforceable, browsewrap agreements are less commonly enforced "because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.*

Defendant's game screens show that the agreement in this case falls into a third category, known as a "sign-in wrap" agreement, which presents a hyperlinked terms of use to users that they affirm by signing or logging in (instead of by clicking a button to affirm). *See Berman*, 30 F.4th at 866 (Baker, J., concurring); *Marshall*, 2024 WL 2325197, at *5. A sign-in wrap agreement falls between a scrollwrap or clickwrap agreement, which require a user to scroll through the terms or click a button indicating that they agree to the terms, and a browsewrap agreement, which does not require a user to do anything but use the site in order to be bound to the terms. *Berman*, 30 F.4th at 866 (Baker, J., concurring) ("Instead [of clicking 'I agree'], the consumer is purportedly bound by clicking *some other* button that [they] would otherwise need

to click to continue with [their] transaction or [their] use of the website—most frequently, a button that allows the consumer to 'sign in' or 'sign up' for an account." (emphasis in original)). "There is nothing automatically offensive about such agreements, *as long as* the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Id.* (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 289 Cal. Rptr. 3d 1, 21 (Cal. Ct. App. 2021) (emphasis in original)).

Courts confronted with online agreements have devised rules to determine whether meaningful assent has been given in order to avoid the unfairness of enforcing contractual terms that consumers never intended to accept.[3] *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 476 (9th Cir. 2024) (citing *Berman*, 30 F.4th at 856). Unless a website operator can show actual knowledge of an agreement by a consumer, an enforceable contract will be found only where: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*; *see also Wilson*, 944 F.3d at 1220. "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id.* (quoting *Berman*, 30 F.4th at 856).

This motion turns on whether Plaintiff had reasonable notice of the arbitration provision based on the online agreements.

---

[3] Defendant seems to characterize its contract as a browsewrap agreement. *See* Dkt. No. 11 at 5 ("[i]n determining the validity of a browsewrap contract…"). However, the agreement appears to be a sign-in wrap agreement to the Court, and the Court analyzes it as such but notes that the inquiry is the same regardless of whether the agreement is a browsewrap or sign-in wrap agreement. *Berman*, 30 F.4th at 856.

### 2.      Actual Knowledge of an Agreement

First, Defendant asserts that it "disagree[s] that Plaintiff did not have actual knowledge of Defendant's [Terms of Service]" but does not present any evidence or further argument on this point. Dkt. No. 11 at 5. But any doubt at this stage of the case is resolved in favor of the nonmoving party. *Hansen*, 1 F.4th at 670. Therefore without more, Defendant has failed to establish by a preponderance of the evidence that a contract exists due to Plaintiff's actual knowledge of the agreement.

Second, Defendant's motion asserts that because Plaintiff has played Defendant's games, "[a]s such he . . . [is] bound to the Terms of Service to which [he] agreed in order to access and play [Defendant's] games." Dkt. No. 4 at 3. Defendant cites to a declaration of Joel Agena, Playstudios's General Counsel and Secretary (Dkt. No. 4-1 ¶ 1), attesting that "[p]layers of Playstudios'[s] games are bound by the Terms of Service, which they are required to accept in order to play Playstudios'[s] games" (Dkt. No. 4-1 ¶ 5). This assertion assumes as a foregone conclusion that there was actual notice. But this type of conclusory statement provides the Court with no specific facts as to how players of Defendant's games, or more importantly for purposes of this motion, this particular Plaintiff, receive actual notice of or agree to Defendant's Terms of Service. *See Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (finding no genuine issue of fact regarding when an IRS form was sent where the supporting declaration contained only a conclusory statement that the form had never been received); *see also Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1104 (S.D. Cal. 2018) ("[D]eclarations that contain only conclusory statements, instead of specific facts, are insufficient unless accompanied by other evidence to corroborate the statements."); *Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130, 143 (D. Conn. 2016) ("[P]laintiff may not simply allege that 'the parties agreed' . . . . [A]ny conclusory allegation of an 'agreement' is not to be accepted as true; the

1    plaintiff must allege *facts* affirmatively demonstrating such an agreement." (emphasis in

2    original)); *Garza v. Ayvaz Pizza, LLC*, No. C23-1379, 2023 WL 6518092, at *5 (S.D. Tex. Oct.

3    5, 2023) (finding that reliance on declaration for proposition that arbitration rights had been

4    assigned to defendant was insufficient to meet burden on motion to compel arbitration). Further,

5    Mr. Agena's declaration contains no specific facts as to how he knows that Plaintiff accepted

6    Defendant's Terms of Service or that Plaintiff did not engage in the opt-out procedure; he does

7    not state how long he has served in either of his two roles with Defendant, or how he acquired

8    the knowledge of the Parties' transactions pursuant to those roles. *See Jacobson Warehouse Co.,*

9    *Inc. v. Lindt & Sprungli (N. Am.) Inc.*, No. C19-1889, 2021 WL 5087622, at *7 (E.D. Cal. Nov.

10   2, 2021) (declining to draw inferences that declarant had personal knowledge of the parties'

11   transactions where declaration did not detail or offer evidence of such knowledge).

12           The only other specific "facts" of *how* Defendant alleges that Plaintiff received notice of

13   and agreed to be bound by Defendant's Terms of Service is Defendant's assertion that "Courts in

14   the Ninth Circuit and elsewhere routinely grant motions to compel arbitration where the plaintiff-

15   user agreed to online terms of service, including an arbitration clause, under signup flows

16   materially identical to Playstudios's[s]." Dkt. No. 4 at 8. But not only does Defendant fail to

17   provide any evidence of its sign-up flows, which would allow the Court to compare Defendant's

18   sign-up flows to those in the cited cases, it fails to even describe those sign-up flows to the Court

19   in its motion. The parenthetical explanations Defendant provides for its cases in support of its

20   position seem to distill the issue to one of mere proximity of a notice to a sign up or other action

21   button. But it is not that simple to establish notice. *See infra* Section III.B.3.a.

22           Further, Defendant cites to *Patrick*, pointing to the court's "holding that use of a

23   'browsewrap agreement[], in which a website offers terms that are disclosed only through a

24   hyperlink and the user supposedly manifests assent to those terms simply by continuing to use

1  the website' is sufficient information to put a consumer on inquiry notice of [an] arbitration

2  agreement," as supportive of Defendant's own sign-up flows. Dkt. No. 4 at 8 (citing *Patrick*, 93

3  F.4th at 477). But in *Patrick*, the district court determined (and the plaintiffs did not challenge

4  the finding on appeal) that the Plaintiffs had acknowledged seeing a hyperlink to the terms and,

5  therefore, had at least "inquiry notice" of the arbitration agreement. *Patrick*, 93 F.4th at 476. No

6  such acknowledgment exists here.

7      Additionally, Defendant has provided the Court with "[a] true and correct copy of the

8  current Terms of Service." Dkt. No. 4-1 ¶ 5; *see also* Dkt. No. 4-1 at 3–23. But Defendant does

9  not state the date when these Terms of Service were first adopted, nor does it make any

10  representations as to whether the Terms of Service in effect in 2019, when Plaintiff began

11  playing Defendant's games, contained an arbitration agreement or delegation clause. While

12  Defendant argues that "Mr. Kuhk's repeated and frequent use reasonably supported a finding of

13  mutual assent to the contract terms," it fails to present any evidence showing what those contract

14  terms actually were when Plaintiff began using Defendant's websites. In contrast, the case cited

15  by Defendant to support this proposition detailed the specific contract terms in effect for the

16  entire time the plaintiff had used the site. *See Domain Name Comm'n Ltd. v. DomainTools, LLC*,

17  No. C18-0874, 2018 WL 4353266, at *2 (W.D. Wash. Sept. 12, 2018).

18      Without providing even the most basic information about *how* users presumably become

19  bound to Defendant's Terms of Service (to try to establish that Plaintiff perhaps had actual

20  notice), or that those Terms of Service contained an arbitration clause for the duration of the time

21  Plaintiff played Defendant's games, Defendant has failed to meet (or even approach) its burden

22  to prove by a preponderance of the evidence that the Parties formed an agreement to arbitrate.

23  However, because Plaintiff has provided the Court with homepages of two of Defendant's games

24  (which neither Party assigns a time restriction to), and because Plaintiff does not appear to

1    dispute that the Terms of Service were relevant for the duration of time he played Defendant's

2    games, the Court will continue to an analysis of whether an enforceable contract exists where

3    actual notice has not been shown.

4        **3.        Demonstrating an Enforceable Contract without Proof of Actual Notice**

5            ***a.        Reasonably Conspicuous Notice***

6            To determine whether a website provides reasonably conspicuous notice, courts consider,

7    among other things, "the transactional context, the notice's size relative to other text on the site,

8    the notice's proximity to the relevant button or box the user must click to complete the

9    transaction or register for the service, and whether the notice's hyperlinks are readily

10   identifiable." *Berman*, 30 F.4th at 868 (Baker, J., concurring). "[The] notice must be displayed in

11   a font size and format such that the court can fairly assume that a reasonably prudent Internet

12   user would have seen it." *Berman*, 30 F.4th at 856. Additionally, "while it is permissible to

13   disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be

14   readily apparent. Simply underscoring words or phrases . . . will often be insufficient to alert a

15   reasonably prudent user that a clickable link exists." *Berman*, 30 F.4th at 857. "Customary

16   design elements denoting the existence of a hyperlink include the use of a contrasting font color

17   (typically blue) and the use of all capital letters, both of which can alert a user that the particular

18   text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.*

19   at 857 (citing *Sellers*, 289 Cal. Rptr. 3d at 29). "Ultimately, 'the conspicuousness and placement

20   of the Terms of Use hyperlink, other notices given to users of the terms of use, and the website's

21   general design all contribute to whether a reasonably prudent user'" would have notice of a sign-

22   in wrap agreement." *Benson v. Double Down Interactive, LLC*, No. C18-0525, 2018 WL

23   5921062, at *3 (W.D. Wash. Nov. 13, 2018) (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d

24   1171, 1177 (9th Cir. 2014) (discussing browsewrap agreements)).

Defendant compares the notice in this case to that in *Patrick*, where the Ninth Circuit

determined that defendant's terms of service were reasonably conspicuous. 93 F.4th at 477. In

*Patrick*, the court found that:

> Running Warehouse includes explicit notice on the final order
> review page, directly below key information such as the purchase
> total, and directly below the button Arcilla tapped to complete his
> purchase. The notice is on an uncluttered page and is not hidden or
> obscured. The notice is clear and legible, and the hyperlinked
> phrase "terms of use" is colored bright green—contrasted against
> the surrounding white background and adjacent black text.
> Moreover, the "terms of use" hyperlink is the same color as other
> clickable links on the page, suggesting clearly that it is a hyperlink.

*Id.* Defendant argues that "[h]ere, users are alerted to Defendant's hyperlink with both a different

font, different color from the background, and the use of all capital letters TERMS OF

SERVICE." Dkt. No. 11 at 10.[4]

Plaintiff contends that the notice in this case is not reasonably conspicuous, pointing to

the "tiny, nearly transparent text" of the notice, the placement "at the bottom of a consumer's

cellphone screen," and the unreadability of the "you agree" message against the dark

background. Dkt. No. 9 at 22. Plaintiff also argues that "[t]here is no blue underlining or any

other signal to consumers that beneath the tiny letters lurks a hyperlink," and that "the notice is

completely overwhelmed by the significantly larger, colorful, bold text and graphics inviting the

consumer to play slots in a shiny, virtual casino." *Id.* Plaintiff additionally submits a declaration

noting that the in-app experience includes "bouncing golden light across the word 'MGM,'

---

[4] Defendant additionally argues that when its apps are opened on an iPhone, "the notification . . . language is much brighter and more visible than when both launch pages are transposed onto an 8.5 x 11 page as in Plaintiff's opposition." Dkt. No. 11 at 3 n.1. But Plaintiff submits a declaration in support of its opposition that includes screenshots from an iPhone (Dkt. No. 10 ¶ 2), and Defendant—the party bearing the burden of proving the existence of the valid arbitration agreement—submits no evidence in support of its assertion. The Court will therefore consider the screenshots provided by Plaintiff as accurate representations of the notice of Defendant's Terms of Service.

1  spinning individual letters of 'S-L-O-T-S' until they line up like pairs of cherries, and making the

2  word 'POP!' float and bounce." Dkt. No. 10 ¶ 3.

3      Here, the Court finds that Defendant's sign-in wrap notice was not conspicuous. In

4  *Patrick*, the notice was determined to be "plainly readable" where the text was "bright green—

5  contrasted against the surrounding white background." 93 F.4th at 477; *see also Karim v. Best*

6  *Buy Co., Inc.*, No. C22-4909, 2023 WL 3801909, at *3 (N.D. Cal. June 2, 2023) (finding the text

7  of the notice "plainly readable" where it contrasted clearly with white background). The Court

8  finds the text in the notice here more akin to that in *Berman*, where the terms and conditions

9  were "printed in tiny gray front considerably smaller than the font used in the surrounding

10  website elements, and indeed in a font so small that it is barely legible to the naked eye." 30

11  F.4th at 856–57. Here, the font size of the notice is significantly smaller than the font used in the

12  surrounding website elements, and the color of the notice is so similar to the background color of

13  the game homepage that it is barely visible to the naked eye. Further, as in *Berman*, the middle of

14  the screen includes brightly colored graphics (that in this case also include movement and

15  flashing lights), which distract the user from the comparatively small notice. *See* 30 F.4th at 857

16  ("And the textual notice is further deemphasized by the overall design of the webpage, in which

17  other visual elements draw the user's attention away from the barely readable critical text.").

18      Additionally, the hyperlink is not underlined, and the font color of the hyperlink is not so

19  contrasting as to clearly suggest that it is a hyperlink: while it is in a lighter font than the rest of

20  the notice, it is relatively inconspicuous compared to the bright, flashing lights of the logo above

21  it. *See Berman*, 30 F.4th at 857; *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d

22  1089, 1096 (C.D. Cal. 2023) ("Here, the text stating that the user agrees to Defendant's terms of

23  use is in a smaller font than both the "Sign Up" button and the line for account-holders to sign in.

24  The lighter font of the notice language also blends into the white background more than the

darker writing above it, drawing attention away from it."); *cf. Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586–87 (N.D. Cal. 2020) ("Despite Plaintiff's characterization of the font as gray-on-gray, the text contrasts clearly with the background and is plainly readable. . . . The hyperlinks are both in blue, indicating to users that they are clickable; a user would not need to 'click on every word of the sentence in case one of them is actually a link.'" (quoting *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019))); *Allen v. Shutterfly, Inc.*, No. C20-2448, 2020 WL 5517172, at *6 (N.D. Cal. Sept. 14, 2020) (granting motion to compel arbitration where notice was clearly legible on white background with blue, underlined hyperlinks to terms of service). And while the hyperlink is capitalized, which the court notes in *Berman* is a customary design element indicative of a hyperlink, so is the rest of the text in the notice, concealing the hyperlink from the user. *See Serrano*, 666 F. Supp. 3d at 1096 (finding failure to identify the hyperlink by more than mere underlining "highly significant").

The Court acknowledges that there are elements of Defendant's notice that do weigh in favor of conspicuousness. For example, like the notice in *Patrick*, the notice is directly below the button Plaintiff tapped to connect to the game. 93 F.4th at 477; *see also Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024) (noting that notice's location directly beneath the operative button weighed in favor of finding that visual element of conspicuous notice was satisfied). But proximity alone is not enough to give rise to constructive notice. Considering the webpages as a whole, the Court cannot find that Defendant's website sufficiently provided reasonably conspicuous notice to Plaintiff and other users.

### b.    Manifested Assent

Plaintiff must have also made an "unambiguous manifestation of assent" to be bound by the terms and conditions. *Berman*, 30 F.4th at 857. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of

clicking will constitute assent to the terms and conditions of an agreement." *Id.* (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–30 (2d Cir. 2002)).

Here, the notice states: "BY CLICKING CONNECT YOU AGREE TO OUR TERMS OF SERVICE & PRIVACY POLICY." Dkt. No. 10-1 at 2. First, this language is listed in font that is significantly smaller than the words on the buttons above it and are in a color so light and transparent that the existence of the words is barely visible and could be easily missed. Second, there is no "connect" button for a user to utilize—the three buttons that a user might use to connect to Defendant's game are (1) "Sign In with Apple"; (2) "Facebook Connect"; and (3) "Guest Login." *Id.* Arguably, a user connecting with the "Facebook Connect" button might be manifesting assent, but a user connecting with either the "Sign In with Apple" or "Guest Login" buttons is in no way "clicking connect," as the notice states. And Defendant has made no allegation regarding which button Plaintiff used to connect to its games. Defendant has not shown by a preponderance of the evidence that Plaintiff made an unambiguous manifestation of assent to be bound by Defendant's Terms and Conditions.

Thus, the Court finds that Defendant has failed to show that either of the conditions necessary for finding an enforceable agreement based on inquiry notice were satisfied.

## IV.   CONCLUSION

Accordingly, the Court denies Defendant's Motion to Dismiss and to Compel Arbitration (Dkt. No. 4).

Dated this 18th day of October 2024.

Tana Lin
United States District Judge